*UNITED STATES DISTRICT COURT*
for the
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVID A. KIMBALL,<br>as he is the guardian of Joseph S. Kimball, and<br>JANET M. KIMBALL,<br>as she is the guardian of Joseph S. Kimball,<br><br>     Plaintiffs,<br><br>v.<br><br>MASSACHUSETTS DEPARTMENT OF DEVELOPMENTAL SERVICES,<br>JANE RYDER, Commissioner,<br>     Massachusetts Department of Developmental Services,<br>COOPERATIVE FOR HUMAN SERVICES, INC., a Massachusetts corporation,<br>MAHESH SUBEDI, Group Home Manager,<br>     Cooperative for Human Services, Inc., and<br>EMERSON HOSPITAL, a Massachusetts corporation,<br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## VERIFIED COMPLAINT AND JURY DEMAND

Joseph S. Kimball ("Joseph") is a profoundly intellectually disabled man with an I.Q. of

57. Despite having an Individual Service Plan funded by the defendant Massachusetts

Department of Developmental Services ("DDS") through an agency relationship with defendant

Cooperative for Human Services, Inc. ("CHS"), Joseph has been routinely hospitalized, assaulted

and restrained. He is heavily medicated and yet has been allowed to elope almost at-will from

the CHS-managed group home where he resides. Plaintiffs David A. Kimball and Janet M.

Kimball (collectively "Plaintiffs") fear for their son, have lost all faith in defendant CHS and

therefore, as they are Joseph's guardians, file this Verified Complaint in the United States

District Court for the District of Massachusetts seeking immediate injunctive relief.

Further, Plaintiffs seek redress for violations of, *inter alia*, The Federal Civil Rights Act, 42 U.S.C. § 1983, Medicaid Act 42 U.S.C.A. § 1396, and the Massachusetts Civil Rights Act, M.G.L. c. 12, s. 11H-11J.

Joseph has been diagnosed with Intellectual Disability (ID), Post Traumatic Stress Disorder (PTSD), Pervasive Developmental Disorder, Not Otherwise Specified (PDD-NOS), which is part of the Autism Spectrum Disorder (ASD), Attention Deficit Hyperactivity Disorder (ADHD), Anxiety Disorder and Self-Injurious Behavior with frequent head injuries.

Plaintiffs file this Verified Complaint against DDS, its Commissioner Jane Ryder, CHS, and its employee Mahesh Subedi, Manager of the Acton, Massachusetts group home where Joseph resides ("Mr. Subedi") and Emerson Hospital in Concord, Massachusetts (for injunctive relief only), where Joseph has been admitted for the last 67 days.

Due to numerous and repeated injuries and hospitalizations, including a recent assault resulting in strangulation and crushed thyroid cartilage, Plaintiffs pray DDS be ordered to transfer Joseph from his Acton, Massachusetts, CHS-operated group home to either a Massachusetts Intermediate Care Facility for Individuals with Intellectual Disabilities ("ICF") or to a group home operated by DDS close to Springfield, Massachusetts.

Joseph resides at Spruce Street, in Acton, Massachusetts, at a DDS funded group home operated by Defendant CHS.  He was also participating in a day program operated by NuPath, Inc. but due to COVID 19 restrictions and his profound behavioral issues, Joseph has not attended same since COVID 19.  Presently Joseph is a patient at Emerson Hospital ("Emerson") for psychiatric treatment and medical evaluation.  However, his discharge is imminent, requiring an immediate transfer to an ICF or state-operated group home.

2

Joseph has a long history of self-injurious behavior. He has been diagnosed with many ailments including but not limited to intellectual disability and autism spectrum disorder with anxiety and was deemed ICF eligible by the Massachusetts Department of Developmental Services since his 22nd birthday in January 2020, almost three (3) years ago.

## PARTIES

1. Plaintiff David A. Kimball (hereinafter "Mr. Kimball") is an adult man residing in Milford, Connecticut and is Joseph's father and co-guardian. Mr. Kimball was appointed guardian for Joseph by the Middlesex Probate and Family Court (docket number MI16P0082GD) on February 25, 2016.

2. Plaintiff Janet M. Kimball (hereinafter "Mrs. Kimball") is an adult woman residing in Milford, Connecticut and is Joseph's mother and co-guardian. Mrs. Kimball was appointed Joseph's guardian by the Middlesex Probate and Family Court (docket number MI16P0082GD) on February 25, 2016.

3. Collectively, Mr. Kimball and Mrs. Kimball shall hereinafter be referred to as the "Plaintiffs."

4. The Massachusetts Department of Developmental Services (hereinafter "DDS") is a division of the Commonwealth of Massachusetts by M.G.L. c. 19B, having a principal office located in Boston, Suffolk County, Massachusetts.

5. Defendant DDS Commissioner Jane Ryder (hereinafter "Commissioner Ryder") is the Commissioner of DDS and has a principal office located in Boston, Suffolk County, Massachusetts. Commissioner Ryder is named herein for injunctive relief only.

6. Defendant Cooperative for Human Services, Inc. (hereinafter "CHS") is a Massachusetts corporation with a principal office located at 420 Bedford Street, Suite 100, Lexington, Middlesex County, Massachusetts 02420.

7. CHS is the DDS agent, along with DDS, responsible for ensuring administrative and legal compliance of Joseph's Individual Service Plan ("ISP").

8. CHS also is supposed to be implanting Joseph's behavior plan which lays out in detail how to keep Joseph's self-injurious behaviors at bay.

9. Defendant Mahesh Subedi (hereinafter "Mr. Subedi") is employed by CHS as Manager of the Acton group home and, because he is the manager of the Acton home where Joseph resides, has extensive knowledge of Joseph's intellectual disability and behavioral crisis.

10. Defendant CHS operates the group home in Acton, Massachusetts in which Joseph resides ("Acton home.")

11. Defendant Emerson Hospital is a Massachusetts corporation with a principal and/or usual place of business at Nine Acres Corner, Concord, Middlesex County, Massachusetts. Emerson Hospital is named herein for injunctive relief only.

## JURISDICTION AND VENUE

12. United States District Court for the District of Massachusetts has jurisdiction over this matter under Title II of the ADA, 42 U.S.C. § 12131-12134; 42 U.S.C. § 1983; and 28 U.S.C. §§ 1331 and 1345. The Court may grant the relief sought in this action pursuant to 28 U.S.C. §§ 2201(a) and 2202, and has pendent jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

13. Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391 because all of the acts and omissions giving rise to this action occurred in the Commonwealth of Massachusetts. 28 U.S.C. § 1391(b).

## FACTS

14. Joseph S. Kimball (hereinafter "Joseph") was born on January 16, 1998.

15. Joseph was adopted from a Romanian orphanage at the age of two and suffered from severe neglect.

16. Joseph lives with three (3) other men at 30 Spruce Street in Acton, Massachusetts, a CHS operated group home (the "Acton home").

17. While Joseph is verbal, Joseph's three (3) roommates are non-verbal.

18. On January 16, 2020 Joseph moved into the Acton home when he turned 22 years old.

19. Joseph has a history of engaging in aggression (yelling, hitting, punching, biting, grabbing, hair pulling, head butting, and spitting).

20. Joseph's behaviors can escalate when his peers exhibit challenging behaviors, when staff's attention is diverted, or when he gets an inconsistent message from staff.

21. Joseph also has a history of eloping from homes where he has lived.

22. Joseph has a long history of hitting his head, usually with the back of his hand, but occasionally on objects such as walls, doors and windows, and such behavior has occurred repeatedly for well over 10 years.

23. Joseph usually hits his head a few times a day, typically when he is frustrated, upset, anxious or agitated. This has often resulted in a bruise on his forehead.

24. Since the onset of the COVID-19 pandemic, this self-injurious behavior is occurring more frequently along with more verbal outbursts and elopement from the Acton home.

25. Joseph has a long history of headaches for well over 10 years as well as migraines.

26. Joseph has been diagnosed with a myriad of ailments including Intellectual Disability

    (ID), Pervasive Developmental Disorder, Not Otherwise Specified (PDD-NOS), which is

    part of the Autism Spectrum Disorder (ASD), Chronic Post Traumatic Stress Disorder

    (PTSD), Attention Deficit Hyperactivity Disorder (ADHD), Gastroesophageal Reflux

    Disease, Intermittent Explosive Disorder, Obstructive Sleep Apnea, Chronic tension-type

    headaches, Urinary retention, and Anxiety Disorder with Somatization.

27. He is presently prescribed:  Paliperidone 9 mg daily at bedtime (antipsychotic),

    Diazepam 7.5 mg twice a day and 10 mg at bedtime (anxiety), Propranolol LA 80 mg

    daily (migraines), Depakote EC 1000 mg QHS (anxiety), Terazosin 3 mg at bedtime

    (bladder), Vitamin D 1000 U daily, Fenofibrate 144 mg daily (cholesterol), Fluticasone

    spray daily at bedtime (allergies), Melatonin 6 mg QHS (sleep aid), Colace 100 mg twice

    a day (constipation), Senna 2 tabs at bedtime (constipation), Diphenhydramine 25 mg 3

    times a day as needed (agitation), Alprazolam 1 mg 3 times a day as needed (anxiety),

    and Phenazopyridin 100 mg 3 times a day as needed (urinary discomfort).

28. Joseph has a very specific dietary protocol that has been developed for him to help

    manage his inability to process oxalates.

29. The Acton home has violated Joseph's dietary protocols and allowed him to eat and drink

    items not on his diet, causing him pain and discomfort.

30. In a recent psychological evaluation of Joseph taken on December 5, 2018, at the age of

    20, by a City of Lynn Public School licensed psychologist, his Full Scale IQ score was

    57, which falls descriptively in the "Low" range of overall cognitive abilities, and which

    reflects profound intellectual disability.

31. Results from his ABAS (Adaptive Behavior Assessment System) score indicates that Joseph's adaptive skills lie in the second percentile range.

32. CHS is bound by its contract with DDS to deliver the services to Joseph that are outlined in his ISP.

33. DDS and CHS are bound by M.G.L. 123B and Chapter 115 of the Code of Massachusetts Regulations.

34. DDS Area Director LynnLee Jordan ("Area Director Jordan") is the DDS Area Director for the DDS Central Middlesex Area Office.

35. Area Director Jordan is responsible for oversight of DDS's contract with CHS for the provision of residential services to Joseph.

36. Isabel Compres is the DDS Human Service Coordinator ("HSC Compres") responsible for the administration of Joseph's ISP, including the annual ISP meeting.

37. HSC Compres reports directly to Area Director Jordan.

38. Joseph has been repeatedly hospitalized for the last two years.

39. Area Director Jordan is aware that Joseph's Individual Service Plan ("ISP") is in failure.

40. Joseph's ISP is monitored by DDS and Area Director Jordan out of the Central Middlesex Area Office in Acton Massachusetts.

41. Area Director Jordan is responsible for ensuring that Joseph's ISP is in legal, financial and regulatory compliance.

42. As described below, Area Director Jordan is expressly aware of Joseph's intellectual disability and behavioral issues, including repeated elopements, violent behaviors, assaults by and against him and numerous hospitalizations, and is aware that his ISP is in failure.

43. On May 27, 2022, Area Director Jordan served Joseph's Plan of Care directly upon Plaintiffs David and Janet Kimball.

44. In said letter Area Director Jordan explained that the Plan of Care is a document DDS must prepare to obtain federal reimbursement under the Medicaid Home and Community Based Waiver Program to help pay for services provided to Joseph.

45. In said letter Area Director Jordan explained that the Plan of Care consists of two parts, Part I and Part II.

46. In said letter Area Director Jordan explained that Part I deals with Joseph's residential habilitation and community based day supports.

47. In said letter Area Director Jordan explained that Part II deals with Joseph's non waiver services including day habilitation and adult service coordination.

48. She further explained that in order to prepare the Plan of Care she needed to have knowledge and be familiar with Joseph's Behavior Plan.

49. Area Director Jordan has knowledge and is familiar with Joseph's annual ISP.

50. HSC Compres, who reports directly to Area Director Jordan, chairs Joseph's ISP meetings.

(A)    **The commonwealth's Use of Corporate Care Providers Such as CHS to Perform a Traditional Public Function**

51. Delivery of services to intellectually disabled persons in Massachusetts has exclusively, historically, and traditionally been delivered directly by the government of the Commonwealth of Massachusetts ("the Commonwealth").

52. Regulation and custodial care of the intellectually disabled was one of the very first public functions in Massachusetts, and has been continuously shouldered by it since the 1600s.

53. More specifically, laws dating to the 1600s establish the care of the intellectually disabled was a traditional public function in Massachusetts long before the Commonwealth was even constituted in its current form.

54. The first statutory reference to persons with intellectual disabilities is found in the Colonial Laws of Massachusetts, the Body of Liberties of 1641.  Section 14, page 35 stated that "[a]ny Conveyance or Alienation of land or other estaite, what so ever, made by any . . . Ideott or distracted person, shall be good if it be passed and ratified by the consent of a general Court."

55. The Province of the Massachusetts Bay, which is the direct precursor of the Commonwealth of Massachusetts, came into being in 1629 and then received a royal charter in 1691.

56. In 1693-94, the Province of the Massachusetts Bay enacted "An Act for the Relief of Ideots and Distracted Persons."  It provided that "the selectmen or overseers of the poor of the town. . . hereby are empowred [sic] and enjoyned [sic] to take effectual care and make necessary provision for the relief, support and safety of such impotent or distracted persons, at the charge of the town. . ."

57. The statute also allowed local justices of the peace to order such persons "to proper work or service. . . at the discretion of the selectmen or overseers of the poor."

58. These historical statutes therefore demonstrate that custodial care of the intellectually disabled has traditionally been an exclusive state function in the Commonwealth even before the dawning of the Commonwealth in its present form.

59. Corporate care providers such as CHS in providing services to persons such as Joseph, therefore perform a function that has traditionally been exclusively reserved to the Commonwealth.

(B)   **The Deinstitutionalization of Persons with Intellectually Disabilities and Congress' Creation of the Waiver Program**

60. For most of the 19th and 20th centuries, intellectually disabled individuals in Massachusetts were housed in either nursing homes, psychiatric wards of hospitals, or institutions which would come to be known as Intermediate Care Facilities ("ICFs"). The latter were large, campus-based facilities that would become a dominant force beginning in the early 20th century.

61. Dogged advocacy by parents and guardians of intellectually disabled people, as well as landmark judicial decisions, eventually led to a trend in the second half of the 20th century towards deinstitutionalization, both in the Commonwealth and nationwide.

62. The trend towards deinstitutionalization was also fostered by changes to the federal Medicaid program, allowing the states to be reimbursed by the federal government for services provided to the intellectually disabled in ICFs and in community settings.

63. Medicaid is a partnership between the states and the federal government, with the two sharing the costs of providing Medicaid services. More specifically, state Medicaid spending/costs are reimbursed by the federal government at a rate determined through a formula for each state.

64. Initially, Medicaid regulations required states to use federal funds solely for ICFs or hospital programs. In 1981 federal Medicaid regulations were changed to allow states to request permission to provide care in community-based settings.

65. This new program, authorized under section 1915(c) of the Social Security Act and known as the Home and Community-Based Services Waiver ("the HCBS Waiver" or "the Waiver Program") allowed states to use funds that otherwise would have been used for ICF care for a wide variety of home and community-based services for intellectually disabled people.

66. In short, the HCBS Waiver meant that states, so long as they made and carried our certain "assurances," could receive funds to care for individuals not just at ICFs, but also in community-based group homes and that they could pay companies, like CHS, to deliver those community-based services.

67. For Fiscal Year 2023, the DDS budget is more than $2,400,000,000.00, with much of that being paid for, or reimbursed, by the HCBS Waiver.

68. Massachusetts has had a HCBS Waiver since 1985, and uses it to fund home and community-based care.

69. Massachusetts' receipt of HCBS Waiver funds requires it to honor the right of disabled persons to select their provider of residential services.  Specifically, 42 U.S.C. § 1396n(c)(2)(C) ("the Choice Provision") places stringent requirements upon states that receive an HCBS Waiver from the federal government.

70. These stringent requirements that the states must satisfy include "assurances" that intellectually disabled people have choices about where they live, including the right to live in either an ICF or a community-based group home.

71. Joseph is ICF eligible.

72. The Choice Provision provides that "[a] waiver shall not be granted under this subsection unless the State provides assurances satisfactory to the Secretary that. . . such individuals

who are determined to be likely to require the level of care provided in a hospital, nursing facility or intermediate care facility for the [intellectually disabled] are informed of the feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of inpatient hospital, nursing facility services or services in an [ICF] for the [intellectually disabled]." [Emphasis supplied.]

73. The Commonwealth's receipt of HCBS Waiver funds requires an assurance that, "necessary safeguards (including adequate standards for provider participation) have been taken to protect the health and welfare of individuals provided services under the waiver and to assure financial accountability for funds expended with respect to such services." 42 U.S.C. § 1396n(c)(2)(A); 42 C.F.R. § 441.302(a).

(C)   **The Commonwealth and Corporate Care Providers Enter Into a Symbiotic, Pervasive Entwined Relationship Constituting Joint Action**

74. As the pace of deinstitutionalization quickened, the Commonwealth increased its number of DDS-operated group homes where intellectually disabled persons could live and be provided services.

75. In addition to these homes run directly by DDS, it also began contracting with corporate service providers such as defendant CHS to operate homes for intellectually disabled individuals.

76. Over time, the Commonwealth has inexorably increased its reliance on such corporate service providers.

77. Since Fiscal Year 2001, state spending on corporate-operated homes has increased to almost six (6) times the amount spent on DDS operated group homes.

78. The DDS budget contains two separate line items for community-based residential care – one for state-operated group homes, and the other for corporate-operated homes.

79. CHS' actions in providing services for intellectually disabled persons are entwined with governmental policies, and the Commonwealth is entwined with CHS' management and control.

80. Without limitation, the Commonwealth's ability to contract with entities such as CHS is itself dependent on an authorization by the Massachusetts Legislature, specifically Mass. Gen. L. c. 19B. Section 1 of Chapter 19B allows DDS to "enter into agreements with nonprofit charitable corporations. . . for the providing of services for persons with an intellectual disability. . ."

81. It further provides that "[s]uch agreements may provide for the retention of all revenues resulting from all billings and third party reimbursements by such organizations, provided, that the expenditure of such funds is made in conformance with applicable state and federal law."

82. In sum, Chapter 19B creates a *de facto* partnership with Massachusetts corporations, allowing these companies to retain any excess funds in consideration of staying within the limits of its DDS contract.

83. Without limitation, DDS officials are required by statute to oversee and participate in the operation of corporate operated group homes and to ensure that they are operated in compliance with state and federal law. Those officials are required by statute to police and remedy misconduct by corporate providers and the employees of those providers.

84. One of the main vehicles for this oversight is service coordination and ISPs, both of which are managed directly by DDS. In this case HSC Compres and Area Director Jordan.

85. Upon information and belief HSC Compres chairs Joseph's annual ISP meetings.

13

86. This constitutes direct and pervasive involvement by the Commonwealth in the management of corporate care providers such as CHS.

87. In sum, DDS and its officials are pervasively entwined in the management of entities such as CHS, and are engaged in joint action.

88. As an agent of DDS, CHS, together with its officers, directors, and employees, acts under color of law as a creature and instrumentality of the state with respect to the provision of services to intellectually disabled Massachusetts citizens.

89. As a DDS agent, CHS, together with its officers, directors, and employees, has acted under color of law by operating and administering care for intellectually disabled Massachusetts citizens.

90. Defendant Mr. Subedi, acting either willfully or with deliberate indifference to his duties caused Joseph to suffer abuse and neglect, thereby violating Joseph's 14th Amendment right to bodily integrity.

91. Defendant Mr. Subedi, acting either willfully or with deliberate indifference to his duties as Joseph's Group Home Manager failed to follow Joseph's behavior plan thereby violating Joseph's 14th Amendment right to bodily integrity.

**(D)  Defendants CHS  and Mr. Subedi were acting under color of state law**

92. The federal Medicaid program was expanded to help fund care for those with intellectual disabilities and to offer an alternative to ICF-based care.

93. As demands for services for the intellectually disabled increased, DDS began contracting with private corporations, such as CHS, to care for intellectually disabled Massachusetts citizens in local communities.

94. CHS's revenue, approximately $26,000,000 annually, is almost entirely HCBS Waiver monies received from the state and federal governments.

95. The HCBS Waiver provides a financial mechanism for the state to pay for the care intellectually disabled people receive in local communities.

96. In order to receive services under the HCBS Waiver the person must first be determined eligible for ICF care.

97. Joseph has been ICF eligible since 2018.

98. DDS now contracts with approximately 200 private corporations, including CHS, that deliver personal and residential care to intellectually disabled Massachusetts citizens.

99. Of the $2.4 billion appropriated in the DDS Fiscal 2023 budget, nearly $1.4 billion was earmarked for contracts with corporate-operated group homes.

100.     CHS, a Massachusetts corporation, operates DDS funded group homes.

101.     According to its 2019 IRS Form 990, the latest available, CHS generates more than $26 million dollars in revenue.

102.     According to its 2019 IRS Form 990, more than 99% of CHS' revenue comes from the government and other public sources.

**103.**     According to its 2019 IRS Form 990, CHS is responsible for DDS funded residential and other services for 383 intellectually disabled people in Massachusetts.

(E)     Joseph's repeated hospitalizations from the Acton home

104.     Over the course of his residency at the Acton home, Joseph has sustained numerous physical injuries and behaviorally destructive incidents including but not limited to the following: self injurious behavior, physical injury, elopement from Acton home, medical crises, behavioral crises, aggressiveness, assaults, and numerous

15

admissions to Emerson Hospital in Concord, Massachusetts ("Emerson"), both self-admitted and EMS admitted.

105.    After Joseph endured several years as a resident of the Acton home, it is clear that CHS cannot manage his difficult and aggressive behavioral issues as he is constantly in crises of both body and mind.

106.    On December 5, 2020, Joseph was admitted to the emergency room at Emerson after he ran away from the Acton home.

107.    Joseph reported that he ran away because he didn't feel safe at the group home. Two of the staff members yelled at him so he ran away.

108.    He reported that he wanted to hit himself in the head.

109.    Emerson spoke with defendant Mr. Subedi who told the hospital that this type of behavior is typical for Joseph.

110.    On January 29, 2021, Joseph arrived at the Emerson emergency room after having eloped from the Acton home.

111.    Joseph reported that he had become angry after the staff locked him in the bathroom and he wanted to stay at Emerson overnight because he did not like his group home staff.

112.    The hospital spoke with defendant Mr. Subedi on this issue who had knowledge of the behavioral issues for Joseph on this date.

113.    Mr. Subedi reported Joseph tried to hit him on this date but Mr. Subedi backed away before a strike.

114.    On January 30, 2021, Joseph arrived at Emerson emergency room by ambulance after he tried to run away from the Acton home.

115.     Joseph reported that he was not happy at the group home and wanted to spend the night at Emerson.

116.     Emerson staff spoke with Mr. Subedi who reported that Joseph had been behaving in a similar manner ever since his discharge from Emerson the day prior.

117.     On February 15, 2021, Joseph was transported to the emergency room at Emerson by the police.

118.     Joseph had gotten into a fight with a group home staff member, Mike.

119.     Joseph reports that Mike made him angry so he hit him and ran.

120.     He told the hospital that he wanted to stay at the hospital over night because he does not like the staff at the Acton home.

121.     The hospital spoke with defendant Mr. Subedi who did not know why Joseph tried to run off but did state that this type of behavior is typical for Joseph.

122.     Mr. Subedi told the hospital staff that Joseph has a low frustration-tolerance and will hit his head or say that he feels unsafe when upset.

123.     On April 9, 2021, Joseph was transported to the Emerson emergency room by the police after running away from the Acton home with bare feet.

124.     Staff tried to restrain Joseph, but he was able to run away from the Acton home.

125.     Joseph wanted to stay at the hospital because of the way he is treated at the Acton home and did not feel safe at the Acton home.

126.     On May 9, 2021, Joseph was again transported by the police to the Emerson emergency room, after he had tried to flee from the Acton home.

127.     On September 19, 2021, Joseph called 911 and the fire department transported him to the Emerson emergency room after Joseph got into a physical altercation with the Acton home staff after he tried to leave.

128.     Joseph punched, kicked and scratched staff after staff blocked the door to keep him from leaving.

129.     Joseph showed Emerson staff his scraped knee-cap that he reports was injured during the altercation.

130.     Hospital staff spoke with defendant Mr. Subedi who advised that Joseph was given medication to calm his anxiety and that the staff member who got into the altercation with Joseph had gone home for the day.

131.     On October 10, 2021, Joseph presented at Emerson after he eloped from the Acton home.

132.     On November 17, 2021, Joseph was transported to Emerson by ambulance on a section 12 by the Acton police department.

133.     It was reported per section 12, "assaultive towards group home staff, kicking and punching because he doesn't like the manager."

134.     As shown above, prior to December 2021, Joseph was admitted to Emerson on at least ten (10) occasions.

135.     Each occurrence demonstrates an ongoing critical crisis for Joseph at CHS and the need for his transfer to a safe environment, e.g., an ICF or a DDS-operated group home.

136.     Upon information and belief working at a DDS operated group homes offer higher pay, pensions, tuition reimbursement and union membership resulting in lower staff turnover.

137.     It is further evident from the numerous hospital admissions that staff at CHS is ill-equipped and ill-prepared to handle Joseph's many behavioral crises, and to protect Joseph's health, safety, and welfare.

**(F)     Joseph is transported from the Acton home to Emerson  on 12/16/2021 for a self-injurious behavior crisis.**

138.     On December 16, 2021, Joseph was transported by the Acton Police Department to Emerson because it was reported he was attempting to run away from the Acton home.

139.     Joseph had attempted to leave the home and when staff blocked his way, it was reported that he started to push and kick CHS staff.

140.     At the hospital Joseph was placed in mechanical restraints.  Once the restraints were removed, he explained that another resident broke a CD of his and broke his bedroom door and this upset him.

141.     Joseph was eventually discharged and returned to the Acton home.

**(G)  Joseph is transported from the Acton home to Emerson for a second time on 12/16/2021 resulting from a self injurious behavior crisis.**

142.     On December 16, 2021, Joseph was transported by the Acton Fire Department to Emerson a second time that day because he was hitting his head on the back of the seat in front of him on the ride back to the Acton home from Emerson after he had been discharged earlier that day.

143.     The Acton home staff should have transported him back to the hospital immediately.

144.     Joseph was injuring the Acton home staff.

145.     One Acton home staff member was kicked in the chest and sent to the hospital.

146.     Janice Ellis-Balerini, LMHC, Director of Clinical Support Services for defendant

CHS reported that it was not appropriate for Joseph to return to the Acton home due to

his unpredictable behavior and hurting staff.

147.     Kenneth Preston, Director of the Residential Services for defendant CHS reported

that this was the 14th time that the CHS home brought Joseph to the Emerson ER, and

each time the hospital sent him back to the Acton home.

148.     It was further reported Mr. Preston stated that Joseph was going to seriously hurt

someone and he is unsafe to return to the Acton home because he is attacking staff.

149.     During the hospital stay Joseph was voicing that he did not want to return to the

Acton home.

150.     At any time CHS could have terminated its contract with DDS and forced action

on this chronic ISP failure.

### (H) Joseph is admitted to Fuller Hospital on December 16, 2021

151.     Joseph was admitted to Fuller Hospital after the behavior crises on December 16,

2021.

152.     He remained admitted until January 3, 2022.

153.     Fuller Hospital is a full-service Behavioral Health Center.

154.     Joseph was referred to Fuller Hospital from the Acton home due to increasing

aggressive behavior.

155.     Fuller Hospital records show that Joseph had reportedly been presented to the

emergency room at Emerson 14 times between January, 2020 and December, 2021.

156.     All these visits to Emerson ER had been either for aggressive or self-injurious

behavior.

157.     Joseph had numerous restraints during the course of his hospitalization at Fuller
Hospital, the first occurring on 12/16/2021 when he attempted to kick, hit and grab staff.

158.     On this occasion Joseph was placed in a brief hold and received Haldol 10mg,
Benadryl 50 mg, and Ativan 2 mg.

159.     Joseph also had restraints applied on 12/18/2021, 12/19/2021, 12/25/2021,
12/29/2021, 12/30/2021, 01/02/2022, and 01/02/2022 (2d restraint that day).  All these
restraints were due to Joseph's aggressive behavior towards hospital staff.

160.     Fuller Hospital Psychiatric Evaluation opines that Joseph is "dangerous to self,
others or property with need for controlled environment."

161.     Fuller Hospital Psychosocial Assessment lists CHS employees Ms. Ellis, Mr.
Preston and Mr. Subedi as current providers of services and current contacts for Joseph.

162.     At no time did any of these defendants seek to terminate the CHS-DDS contract
relevant to Joseph's ISP.

**(I)  Joseph elopes from the Acton home on 1/28/2022 and is treated at Emerson**

163.     On January 28, 2022, Joseph was complaining of a headache while at the Acton
home and while staff was giving him Tylenol he walked out the front door and
disappeared from the Acton home.

164.     He was found later at a local pizza shop with no shoes on and the pizza shop
called 911.

165.     Joseph was later hospitalized at Emerson where he was upset and crying.

166.     He was eventually returned to the Acton home.

167.     On January 31, 2022, Joseph's mother and Guardian emailed CHS's Ms. Ellis,
Mr. Subedi, Mr. Preston and Joseph's service coordinator HSC Compres:

What's being done to decrease the risk of this happening again? Of course we don't know what happened on Friday. But when we've been to visit Joseph and look inside the house there's usually at least one staff member sitting on the couch watching TV. This raises concerns for us …is all the staff aware of what's happening in the house and able to quickly respond, what other tasks need to get done and what order to contact whom?

When I took Joseph out for his birthday he was wearing someone else's sneakers. He said he and staff didn't know where his sneakers were. He's also been wearing clothes that aren't his. This also raises concerns. Joseph's clothes and laundry should be keep separate from the other resident's belongings. (Why not have each resident do their laundry in a different day so that clothes don't get mixed up?) We purchase clothes for Joseph, not for his housemates.

We were told that upon discharge from Sturdy Hospital that Joseph would have a daily schedule with reinforcers built in. Has that been done and is it being enforced? We would like a copy of the schedule, please.

What's happening with Joseph's diet? Has the nurse provided staff training and is that training being followed? We would like to be provided with a copy of his food log on a weekly basis, please.

When will it be possible for Joseph to start attending classes at Adaptive Fitness and Movement? This will be a good opportunity for both physical movement and socialization. Here is a link to the website. https://www.adaptivefitnessandmovement.com/

Thank you. Please let us know how we can assist you to help Joseph to meet his potential.

### (J) Joseph elopes from the Acton home on 3/29/2022 and is treated at Emerson

168.    On March 29, 2022, Joseph climbed out his Acton home bedroom window and

ran down the street towards a gas station.

169.    Someone in the neighborhood called the police and Joseph was transported to

Emerson.

170.    The Acton home staff were not aware Joseph had eloped, and thus police had to

call the Acton home to tell them Joseph eloped.

171.     CHS "awake" staff are supposed to perform checks every 15 minutes during the

night.

172.     While at the hospital Joseph was very aggressive and started lashing out at

hospital staff.

173.     He arrived at Emerson with his sleep clothes on and no shoes.

174.     The hospital reports that Joseph has a history of violence and aggression towards

the staff at the Acton home and was observed trying to hit hospital staff with his arms

when they were attempting to keep him in his bed.

175.     He was eventually returned to the Acton home.

**(K) Joseph elopes from the Acton home on 6/22/2022 and is treated at Emerson**

176.     On June 22, 2022, Joseph was upset and ran out of the Acton home in the middle

of the night.

177.     He was transported to Emerson Hospital due to this incident.

178.     At the hospital Joseph complained about the Acton home and not wanting to go

back.

179.     When advised that he was going to be released to the Acton home he asked, "if I

act out will I be able to go to the hospital?"

180.     He was eventually returned to the Acton home.

**(L)      On 7/11/2022 Joseph is treated at Emerson**

181.     On July 11, 2022, Joseph called 911 from the Acton home and was brought to

Emerson by ambulance.

182.     Prior to that Joseph was on the phone with his mother telling her he was seeing

bright lights, his head hurt and he was nauseous.

183.    Joseph had been having severe migraines and the Acton home staff was unable to alleviate the pain with medication.

184.    He was restrained by the Acton home staff for 10 minutes and when released, he became very aggravated and assaultive.

185.    Joseph felt the staff was targeting him and was abusive towards him and he called 911 to go to the hospital.

186.    He was eventually returned to the Acton home.

### (M)  On July 16, 2022 Joseph is treated at Emerson

187.    On July 16, 2022, Joseph called 911 and was brought to Emerson Hospital by ambulance complaining of abdominal pain.

188.    Joseph was complaining to hospital staff that he does not like his placement at the Acton home.

189.    He was eventually returned to the Acton home.

### (N)  Joseph is hospitalized at Lahey on 7/26/2022

190.    On July 26 Plaintiff Janet Kimball wrote the following email to Mr. Subedi:

Hi mahesh,

As you know, Joseph ended up in the Lahey ER today after seeing Dr Bath. They ended up straight cathing him for 300cc, then he urinated "a copious amount" into the toilet. He's staying the night at Lahey.

He told me that his bladder has been hurting him over that past couple of nights. I asked him if he'd told any staff and he said no "because they were sleeping". I know there is supposed to be one awake staff and one asleep staff overnight. But this isn't the first time he's reported staff sleeping during the night. I don't know if there's any way to track if staff are awake or not, but these reports are very concerning to us. Staff are supposed to be checking in on Joseph at frequent intervals. Is that being tracked/recorded somehow?

We'd appreciate any feedback you have.

Thanks,
Janet and Dave

**(O) Joseph elopes from the Acton home on 8/20/2022 and is treated at Emerson**

191.     On August 20, 2022, Joseph was brought to Emerson by Acton EMS when he was

seen running down the road from the Acton home with no shoes on.

192.     He voluntarily went to the hospital because he did not want to go back to the

Acton home.

193.     Joseph was upset and grabbed his shirt and ran out the door.

194.     He eventually returned to the Acton home.

**(P) Joseph is violently attacked at the Acton home and is transported to Emerson
and the Town of Acton Police investigate**

195.     On August 24, 2022, Joseph was transported to Emerson Hospital by the Town of

Acton EMS.

196.     On said date Joseph was talking about his girlfriend and one of the Acton home

staff employed by CHS told him that he talked too much.

197.     Joseph got mad and kicked the staff member.

198.     The staff member tried to restrain Joseph, but Joseph bit him and the staff

member put his hands on Joseph's neck and applied pressure.

199.     After Joseph was released from the restraints, he was scared and hurt so he ran

away from the Acton home after being assaulted by a staff member.

200.     He was picked up down the street by the Acton EMS when he was complaining of

neck pain.

201.     It was reported by EMS that Joseph had visible marks on his neck and Joseph

stated that his head was slammed on the ground.

202.    Joseph was medically evaluated and determined to have a fracture of the thyroid cartilage.

203.    The following morning hospital staff interviewed Joseph and he was tearful stating that he did not want to go back to the Acton home.

204.    The Acton Police conducted an investigation into the incident of 8/24/2022 and from the police report it is noted that: "Joseph Kimball walking away from the home. [Officer] arrived in the area and located Joseph a short time later at 149 Central Street, Joseph was complaining about be possibly choked by a staff member. Joseph was transported to Emerson Hospital for further evaluation."

205.    According to the police report Acton police reported that a nurse spoke with Mr. Subedi, CHS's supervisor of the Acton home who reported: "Joseph assaulted and bit a staff member while they were attempting to restrain him before he walked away." Mr. Subedi further reported: "believes the injuries might have been a result of them attempting to restrain him."

206.    Currently Joseph remains at Emerson Hospital but the Plaintiffs have been advised by Emerson that it will discharge Joseph imminently and the only place for Joseph to go without a transfer to an ICF or a state-operated group home is back to the CHS-operated Acton home.

207.    Aside from a CHS house on a main street with a 40 mph speed limit, in Bedford, MA, which was declined because of Plaintiffs' safety concerns, neither CHS nor DDS has offered any other residential options.

208.    By refusing to offer safe, sociable, and appropriate housing they are putting Joseph at risk and depriving him of his basic rights under the law.

26

209.     A return to the Acton home would be placing Joseph's life in danger due to elopement, repeated altercations, continued behavioral crises, medical crises, and self injurious crises as well as other bodily injuries and emotional injuries.

210.     From December 2020 to present Joseph has been admitted to the Emerson emergency room department approximately nineteen (19) times.

211.     Joseph's placement at CHS' Acton home has caused a complete breakdown of his ISP and behavior plan, compounded by his inability to make meaningful social connections due to the differences between himself and his housemates.

**(O) Joseph is treated as an outpatient at the Bridgewell Sovner Center**

212.     Joseph has been treated at the Bridgewell Sovner Center, an outpatient behavioral health clinic specializing in medication management, counseling, education, evaluation and other supports for adults with a dual diagnosis of developmental and psychiatric disability, including adults with ASD.

213.     Joseph's initial treatment at the Sovner Center was on June 19, 2020.

214.     He had follow-up care at the Sovner Center on 9/8/2020, 11/23/2020, 2/12/2021, 3/12/2021, 4/9/2021, 4/29/2021, 6/4/2021, 7/15/2022, and 8/5/2022.

215.     The 8/5/2022 notes from the Sovner Center state among other things – "

Today presents with significant worsening over past week, had routine appt with Dr. Bath at Lurie Center and upon leaving escalated significantly, aggressive, attempting to elope and requiring x 3 in parking lot 911 was called. Dr. Bath who was in attendance for this requested MGH but EMTs would not bring him there…Ken Preston has been in regular contact with DDS and it is unclear if there is a plan to identify Joseph as a 'high risk' individual. Parents would like me to reach out to DDS and Dr. Bath as well as write an email suggesting and supporting Hogan admission. Expressed that is not something I am able to do but will reach out to my administration to see how best to proceed with getting Joseph into a safe, secure place.

**(R) Joseph is eligible for transfer to an ICF operated by DDS**

216.     Joseph is ICF-eligible according to the DDS guidelines and regulations.

217.     In a letter dated April 13, 2018, DDS advised Plaintiffs that it had made the determination that Joseph was eligible for Intellectual Disability Services on the basis of Intellectual Disability.

218.     Wrentham Developmental Center and the Hogan Regional Center are the two ICFs in the Commonwealth which accept people with intellectual disabilities similar to Joseph's.

219.     The Plaintiffs believe that it is in Joseph's best interests to have him transferred to either the Wrentham Developmental Center or Hogan Regional Center, the only two ICFs in the Commonwealth or, in the alternative, to a state-operated group home, preferably in the Springfield area.

220.     DDS' representations that there are no placement options for Joseph at Hogan Regional Center's ESU or Wrentham Developmental Center are inaccurate.

221.     Wrentham Developmental Center presently houses approximately 200 people.

222.     Upon information and belief, the Wrentham census is down significantly since prior to the pandemic.

223.     Joseph's primary care doctor James Bath, MD writes a detailed opinion letter dated September 29, 2022, in which he opines that he "would strongly recommend that [Joseph] be placed in an intermediate care facility." See attached Exhibit A.

**(S) Federal Medicaid choice provisions mandate that Joseph has a statutory right to reside at an ICF or DDS-operated group home**

224.     Congress enacted the Americans with Disability Act ("ADA") in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination

against individuals with disabilities." 42 U.S.C. § 1210(b)(1).  Among the specific issues

the ADA addresses are "segregation" and actions that prevent persons with disabilities

from "fully participating in all aspects of society" Id. §§ 1210(a)(1), (5).

225.    Joseph has rights under the Medicaid Act, 42 U.S.C.A. § 1396, which requires the

Commonwealth, as a condition of its receipt of Medicaid funds, to provide appropriate

services with reasonable promptness and **to offer Joseph and similarly situated**

**individuals appropriate choice concerning residential placements.** [emphasis added.]

226.    42 CFR § 441.302 contains the state's assurances for the Medicaid waiver

program.

227.    Said section 441.302 states, "Unless the Medicaid agency provides the following

satisfactory assurances to CMS, CMS will not grant a waiver under this subpart and may

terminate a waiver already granted."

228.    Clause (d) of said section 441.302 states, "Alternatives – Assurance that when a

beneficiary is determined to be likely to require the level of care provided in a hospital,

NF or ICF/IID, the beneficiary or his or her legal representative will be: (1) informed of

any feasible alternatives available under the waiver; and (2) given a choice of either

institutional or home and community based services."

229.    Plaintiffs have been asking DDS to transfer Joseph to an ICF or a DDS operated

group home.

230.    DDS' refusal to transfer Joseph to an ICF or a state operated group home, options

for which he is eligible, is a violation of the HCBS Waiver.

231.    Clause (g) of said section 441.302 states, "Institutionalization absent waiver –

Assurance that, absent the waiver, beneficiaries in the waiver would receive the

appropriate type of Medicaid funded institutional care (hospital, NF or ICF/IID) that they require.

## COUNT I
**(Injunctive Relief Under 42 U.S.C. § 1983 Against Department of Developmental Services and Jane Ryder in her Official Capacity for Violations of 14th Amendment, Medicaid Act, and Rehabilitation Act)**

232.     Plaintiffs hereby incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as if set forth in full herein.

233.     42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . ."

234.     The provisions of 42 U.S.C. § 1983 have been interpreted to allow prospective injunctive relief against state officials as a means of redressing violations of constitutional and statutory rights.

235.     Section one of the Fourteenth Amendment of the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

236.     Defendant DDS and Commissioner Jane Ryder have strategic, operational, and logistical control over the care of 41,000 intellectually disabled individuals in the Commonwealth, including Joseph.  As set forth in more detail herein, the actions of DDS and Commissioner Ryder have, without limitation, resulted in Joseph receiving care in the grossly deficient Acton home.

237.     As described more fully throughout this Verified Complaint, the defendants have

thus acted to deprive Joseph of clearly established constitutional rights and statutory

rights, including, without limitation:

(a) Joseph's  constitutionally protected liberty interest in bodily integrity, and the
right to be free from the abuse and injuries described herein, as provided by the 14th
Amendment to the U.S. Constitution;

(b) Joseph's rights to equal protection under the 14th Amendment to the U.S.
Constitution, in that he is required to remain within the grossly deficient Acton home,
while other intellectually disabled people in Massachusetts are allowed to reside in
compliant state-operated group homes and ICFs;

(c) Joseph's rights under the Medicaid Act, 42 U.S.C.A. § 1396, which requires
the Commonwealth, as a condition of its receipt of Medicaid funds, to  provide
appropriate services with reasonable promptness and to offer Joseph and similarly
situated people appropriate choice concerning residential placements; and

(d) Joseph's rights under the Rehabilitation Act, 29 U.S.C. § 794, providing that
"[n]o otherwise qualified individual with a disability…shall, solely by reason of his or
her disability, be excluded from participation in, be denied the benefits of, or be subjected
to the discrimination under any program or activity receiving Federal financial
assistance….".

238.     The defendants have acted to deprive Joseph of clearly established statutory and

constitutional rights of which a reasonable person would have known.

239.     The defendants have acted under color of law.

240.     The defendants have acted knowingly and in bad faith, and/or with deliberate

indifference.

241.     To remedy these constitutional and statutory violations, the Guardians are entitled

to the injunctive relief requested below.

**COUNT II**
**(Injunctive Relief Under 42 U.S.C. § 1983 Against Department of Developmental**
**Services and Jane Ryder in Her Official Capacity for Enforcement of the Medicaid**
**Act and Rehabilitation Act)**

242.     Plaintiffs hereby incorporate by reference each and every allegation in the
preceding paragraphs of this Complaint as if set forth in full herein.

243.     As set forth in more detail herein, DDS and Commissioner Ryder are engaged in
ongoing violations of 42 U.S.C.A. § 1396 and Section 504 of the Rehabilitation Act, 29
U.S.C. § 794.

244.     DDS, as a condition of its receipt of Medicaid funds and the HCBS Waiver, is
required by these statutes to provide appropriate services with reasonable promptness and
to offer Joseph and similarly situated individuals' appropriate choice concerning
residential placements.

245.     By statute, the HCBS Waiver that DDS has received from the U.S. Department of
Health and Human Services requires that "[s]uch individuals who are determined to be
likely to require the level of care provided in a hospital, nursing facility or intermediate
care facility for the [Intellectually Disabled] are informed of the feasible alternatives, if
available under the waiver, at the choice of such individuals, to the provision of inpatient
hospital, nursing facility services or services in an intermediate care facility for the
mentally retarded." 42 U.S.C. § 1396m(c)(2)(C).

246.     DDS' receipt of federal funds to provide community services is also conditioned
upon its compliance with the Rehabilitation Act, 29 U.S.C. § 794, which provides that
"[n]o otherwise qualified individual with a disability…shall, solely by reason of his or his
disability, be excluded from participation in, be denied the benefits of, or be subjected to
the discrimination under any program or activity receiving Federal financial assistance."

247.     Pursuant to Mass. Gen. L. Chapter 19B and its related regulations, Defendant Jane
Ryder is a Commonwealth official primarily responsible for ensuring that DDS complies
with these provisions of federal law in order to qualify for the HCBS Waiver.

248.     As set forth further herein, DDS is not complying with those provisions of law, as
it is excluding Joseph from obtaining needed care at an ICF, and is instead forcing him to
reside in the grossly deficient Acton home.  Additionally, as set forth herein, DDS has
also failed to comply with the choice provisions of 42 U.S.C. § 1396m(c)(2)(C).

249.     The provisions of 42 U.S.C. § 1983 have been interpreted as a means of enforcing
the provisions of the Medicaid Act and the Rehabilitation Act.

250.     To remedy these statutory violations, the Guardians are entitled to the injunctive
relief requested below, requiring DDS and Commissioner Ryder to cease and desist with
their violations of those provisions, requiring them to take specific steps to comply with
those provisions, and to ensure compliance with state and federal law.

## COUNT III
**(Monetary Damages Under 42 U.S.C. § 1983 Against Mr. Subedi)**

251.     Plaintiffs hereby incorporate by reference each and every allegation in the
preceding paragraphs of this Complaint as if set forth in full herein.

252.     42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute,
ordinance, regulation, custom or usage, of any State …, subjects, or causes to be
subjected, any citizen of the United States or other person within the jurisdiction to the
deprivation of any rights, privileges, or immunities secured by the Constitution and laws,
shall be liable to the party injured in an action at law, suit in equity, or other proper
proceeding for redress. . ."

253.     The provisions of 42 U.S.C. § 1983 have been interpreted to allow monetary

damages against those acting under color of law as a means of redressing violations of

constitutional and statutory rights.

254.     In this matter Mr. Subedi has violated Joseph's constitutional and statutory rights.

255.     Mr. Subedi has acted under color of law as an employee or officer of CHS as

described more fully above.

256.     Section One of the Fourteenth Amendment of the U.S. Constitution provides that

no state shall "deprive any person of life, liberty, or property, without due process of law;

nor deny to any person within its jurisdiction the equal protection of the laws."

257.     As described more fully throughout this Verified Complaint, Mr. Subedi has thus

acted to deprive Joseph of clearly established constitutional rights and statutory rights,

including, without limitation:

   a.  Joseph's  constitutionally protected liberty interest in bodily integrity, and the
       right to be free from the abuse and injuries described herein, as provided by the
       14th Amendment to the U.S. Constitution;

258.     Mr. Subedi has acted to deprive Joseph of clearly established statutory and

constitutional rights of which a reasonable person would have known.

259.     Mr. Subedi has acted knowingly and in bad faith, and/or with deliberate

indifference.

260.     The actions of Mr. Subedi have caused Joseph severe physical and psychological

harm.

261.     To remedy these constitutional and statutory violations, and to compensate Joseph

for the harm he has suffered, the Plaintiffs are entitled to an award of damages, together

with attorneys' fees and costs, against these defendants in an amount to be determined at trial.

**COUNT IV**
**(Preliminary Injunctive Relief Against All Defendants)**

262.     Plaintiffs hereby incorporate each and every allegation in the preceding paragraphs of this Complaint as if set forth in full herein.

263.     The provisions of federal and state law set forth herein, including, without limitation, 42 U.S.C § 1983 and  Mass. G.L. c. 12, § 11I, provide for injunctive relief.

264.     As set forth in more detail herein, Joseph is suffering ongoing severe physical and mental harm, including the risk of death, as a result of the actions of the defendants. These actions include the refusal of DDS and its officials to locate an appropriate state operated home or an ICF for Joseph and to allow him to be transferred there.

265.     As set forth in more detail herein, Plaintiffs have established an extreme likelihood of success on the merits of their claims against defendants.

266.     As such, the Guardians request that this Court enter the following relief:

     a.     An Order compelling Commissioner Ryder to take all necessary steps to forthwith facilitate and allow the transfer of Joseph to an ICF, preferably the Wrentham Developmental Center, or a state operated group home in the Springfield, MA area;

     b.     Until Joseph has been transferred, an Order compelling Commissioner Ryder to take all necessary steps to ensure daily nursing care for Joseph at his current home, and all necessary additional steps to protect the health, safety, and welfare of Joseph;

     c.     An Order compelling CHS, its officers and employees including Defendant Mr. Subedi to take all necessary steps to forthwith facilitate and allow the transfer of Joseph to an ICF or state operated group home in the Springfield, MA area; and

     d.     An Order compelling Cooperative for Human Services, Inc. its officers and employees including Mahesh Subedi to take all  necessary steps to

ensure compliance with Joseph's ISP and Behavior Plan until such time he is transferred elsewhere, and all necessary additional steps to protect the health, safety, and welfare of Joseph.

e.       An Order precluding Emerson from discharging Joseph from its facility prior to his transfer to an ICF or state operated group home.

**WHEREFORE**, Plaintiffs respectfully requests that this Court:

a.       Enter the declaratory, preliminary and permanent injunctive relief requested herein.

b.       Enter an award of actual, compensatory, and punitive damages against the individual defendants pursuant to 42 U.S.C. § 1983, the Massachusetts Civil Rights Act, or any other available provision of law.

c.       Award the Plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. § 1983, the Massachusetts Civil Rights Act, or any other available provision of law.

d.       Award the Plaintiffs such other relief as this Court deems just, equitable and appropriate.

## JURY DEMAND

Plaintiffs hereby demand a jury trial on all counts so triable.

Respectfully submitted,
By Plaintiffs David A. Kimball and
Janet M. Kimball,
By their Attorneys,

Thomas J. Frain, BBO# 567089
Frank E. Bonanni, BBO# 566806
Frain & Associates, P.C.
563 Main Street
Bolton, MA 01740
Tel. 978-779-0749
Fax 978-779-0761
tjf@frainlaw.com

Dated: October 31, 2022

## VERIFICATION

We, David A. Kimball and Janet M. Kimball, as the Guardians of Joseph S. Kimball, hereby affirm under oath that we have each read the foregoing Verified Complaint and that the factual allegations therein as to Joseph S. Kimball and the injunctive relief sought on behalf of Joseph S. Kimball are true as my own knowledge, except those matters stated therein upon information and belief, which I believe to be true.

Dated: 10/29/22

_____
David A. Kimball

Dated: 10/29/22

_____
Janet M. Kimball

EXHIBIT A

Letter Details (Joseph)

PCPO Dr. Bath at the Lurie Center
1 MAGUIRE RD
LEXINGTON MA 02421-3114
Dept Phone #: 781-860-1700
Dept Fax #:  781-860-1766

September 29, 2022

Regarding
Joseph Kimball
Date of Birth: 1/16/1998

To Whom it May Concern:

I am writing on behalf of of Joseph Kimball who has been a patient in my practice for approximately 7 years.  Joseph has autism spectrum disorder, intellectual disability, pervasive developmental disorder and significant anxiety.  He is a kind, conscientious young man who at his baseline is happy, caring and concerned about those around him.  But due to his disabilities, he requires substantial daily support and he has been living in a group residential setting for a number of years now.  The past 2 years have been extremely difficult for Joseph.  His group home, run by the Cooperative for Human Services in Acton, has not been effective in keeping Joseph stable or safe.  Conversely, it has resulted in repeated high risk situations and several injuries.  He was allowed on numerous occasions to elope from the house in a dysregulated state into the community.  This resulted in approximately 26 emergency room visits and many other situations that involved the police or an emergency medical team to get him back to the house.  Moreover the staff were unable to keep him safe inside the house and there were dozens of altercations resulting in injury to both Joseph and the staff.  The most recent and most concerning was when he was brought to the Emerson Hospital emergency room with signs of trauma to his neck.  Given everything that has transpired over the past 2 years, it seems clear that this group home cannot keep him safe and it is recommended that he be placed in a more appropriate home that better matches his abilities and challenges.  In the interim, I would strongly recommend that he be placed in an intermediate care facility prior to settling into a group home.  While the team at Emerson Hospital has been able to stabilize him over the past 4 weeks he is not yet ready to be integrated back into the community.  An intermediate care facility would allow his mental health team to continue to fine-tune his medication regimen as well as put in improved and robust behavioral health plan in place.  This dramatically increases his chance of success in a future group home setting.

Sincerely,

James Bath, MD